UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID BRANDELL JESSIE,

            Petitioner,

v.                                                    CASE NO. 20-13270

                                                      HONORABLE MARK A. GOLDSMITH

GREGORY SKIPPER,

            Respondent.

_____/

**OPINION AND ORDER DENYING THE PETITION FOR A WRIT
OF HABEAS CORPUS (Dkt. 1), DENYING A CERTIFICATE OF APPEALABILITY,
AND DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

This is a pro se habeas case brought pursuant to 28 U.S.C. § 2254.  Michigan prisoner David Brandell Jessie ("Petitioner") was convicted of second-degree murder, Mich. Comp. L. § 750.317, felonious assault, Mich. Comp. L. § 750.82, carrying a concealed weapon, Mich. Comp. Laws § 750.227, assault and battery, Mich. Comp. L. § 750.81, and two counts of possession of a firearm during the commission of a felony, Mich. Comp. L. § 750.227b, following a jury trial in the Oakland County Circuit Court.  Petitioner was sentenced to 37.5 to 70 years imprisonment on the murder conviction, a concurrent term of 23 months to 4 years imprisonment on the felonious assault conviction, a concurrent term of 2 to 5 years on the carrying a concealed weapon conviction, 93 days in jail on the assault and battery conviction, and concurrent terms of 2 years imprisonment on each of the felony firearm convictions, to be served consecutively to the other sentences, in 2012.

1

In his habeas petition, as amended/supplemented, Petitioner raises claims concerning judicial bias, the jury instructions, the conduct of the prosecutor, the effectiveness of trial counsel, the validity of his sentences, and the substance of witness testimony.   Respondent has filed an answer to the habeas petition contending that it should be denied.   For the reasons set forth, the Court concludes that Petitioner is not entitled to relief on his claims and that the habeas petition must be denied.   The Court also concludes that a certificate of appealability and leave to proceed in forma pauperis on appeal must be denied.

## I.      BACKGROUND

Petitioner's convictions arise from a confrontation, assault, and fatal shooting that occurred on a median of Eight Mile Road in Oak Park, Michigan on April 8, 2011.   The Michigan Court of Appeals briefly described the facts, which are presumed correct on federal habeas review, 28 U.S.C. § 2254(e)(1); Wagner v. Smith, 581 F.3d 410, 413 (6th Cir. 2009), as follows:

> After defendant saw a woman he knew on the street, defendant directed [Djuamiel] Huff to hold the gun, and Huff did so. Huff then held the gun as defendant assaulted the woman. Defendant initiated the confrontations, including assaulting the woman, pointing the gun at a man in the Eight Mile median, and, according to multiple eyewitnesses, aiming the gun at and shooting the murder victim. As defendant and Huff fled the scene of the shooting, defendant told Huff to take the gun, which Huff did. Later, in a backyard on Hubbell Street, defendant took the gun back from Huff and threw it over a fence. . . .
>
> In addition to Huff, another witness, Darryl Gray, identified defendant as the shooter. Also, multiple independent eyewitnesses identified the shooter as wearing a gray hoodie in the Eight Mile median, and it is undisputed that defendant rather than Huff was the person in the median who was wearing a gray hoodie.

People v. Jessie, No. 310869, 2014 WL 2751047, at *3, *9 (Mich. Ct. App. June 17, 2014).

The Court also adopts the detailed summary of the trial testimony set forth by the prosecutor on direct appeal and reiterated by Respondent in the answer to the petition, to the extent

that those facts are consistent with the record.    Those facts are as follows:

Julie Smith testified that she lived in Oak Park with her two sons—Trier and Tony Cochrane—as well as Antoine Powe and Darryl Gray. (5/15/12 Trial Tr. at 5–7.) The last time Julie saw Tony was at 3:00 p.m. on April 18, 2011. At approximately 6:45 p.m., Julie heard her next door neighbor, Jasmine Hamilton, screaming "for her life." (Id. at 8–9.) When Julie made it out of her house, she found out that Tony had been shot. (Id. at 10.) A photo of Tony was admitted as People's exhibit 1. (Id. at 11.)

Andre Fisher testified that on April 8, 2011 at approximately 6:30 p.m. he went with his girlfriend, Alake Monroe, to get an oil change at 8 Mile Road and Freeland. (Id. at 17–22.) As they were exiting, Fisher saw two black males run across 8 Mile. One man was wearing all black and the other man was wearing a gray baseball cap, gray hoodie, black pants, and black tee shirt. There were also two black males on the corner of Freeland and 8 Mile. One was light skinned and one was dark skinned. It was daylight at the time. (Id. at 23–25.)

Fisher observed the dark-skinned male walk across the street in the men's direction, and the light skinned male stayed on the corner. The dark-skinned male appeared to be arguing with the male in the gray hoodie. The male in the gray hoodie pulled out a "very big gun." The man in the gray hoodie pointed it straight down at the man who walked across the street and was now on his knees with his hands up in the air. (Id. at 26–30.) Fisher had Monroe back up the car to Ardmore.

Fisher observed that the man on his knees got up and the man in the gray hoodie walked towards Mark Twain Street. (Id. at 31–32.) The man in the gray hoodie and gray hat then turned around, fired one shot, and the light skinned man on the corner hit the ground. (Id. at 32–33.) The gun was pointed toward Freeland. (Id. at 35.) The man in the black jacket was doing nothing when this occurred. The men ran after the shooting. (Id. at 36.)

Elizabeth Maldonado testified that on April 8, 2011, she was working at the chiropractic clinic at 8 Mile and Freeland at approximately 6:30 p.m. (Id. at 74.) Maldonado looked out the window and saw an African-American male with no shirt walking across Freeland. There were two African-American males further down on 8 Mile, standing in the median. (Id. at 78–82, 89.) One of them had on a gray hoodie. (Id. at 82.) The man in the gray hoodie raised up his arm once and then a second time, pointing towards 8 Mile. Maldonado heard one gunshot and saw smoke. She moved away from the window. (Id.) Maldonado could not see if the man had anything in his hands. (Id. at 83.) The man in the gray hoodie and the other man were standing side by side. (Id. at 86.)

3

Alake Monroe testified that on April 8, 2011, at approximately 6:30 p.m. she was leaving the oil lube at 8 Mile and Freeland with her boyfriend, Fisher. She saw two men running and two men standing in the 8 Mile median. It looked like the men were about to fight. (Id. at 103.) One man in the median was wearing a gray hoodie and gray hat and the other man was wearing a black hoodie and black pants. Both were black males. (Id. at 106.) One of the men running was wearing a black shirt and the other man was not wearing any shirt. (Id. at 107.) The man with no shirt was standing at the corner of 8 Mile and Freeland. (Id. at 108.)

The man with the black shirt approached the two men in the median and the man with no shirt stayed on the corner and was waiving his hands. (Id. at 109.) The man with the gray hoodie pulled out a big gun. The gun was about twelve inches long and silver gray. (Id. at 110.) The man with the gray hoodie made the man get down on his knees and then he turned around and walked away. The young man got up off his knees and confronted the two men. The man in the gray hoodie turned around, aimed the gun towards 8 Mile and Freeland with one hand, and shot the man standing there. (Id. at 111, 116.) Monroe heard one gunshot and saw the smoke. The man that was shot fell to the ground. (Id. at 116.) The man in all black was just standing there and had nothing in his hands. (Id. at 113.) The man that was on his knees ran and was screaming that his friend had been shot. (Id. at 115.) Monroe was sure that the gun was silver gray, not black. (Id. at 137, 139.)

John Rescoe testified that he worked at a Chrysler dealership located on 8 Mile between Coolidge and Greenfield. (Id. at 148.) On April 8, 2011, Rescoe was talking with a customer out in the parking lot. (Id. at 149.) Rescoe saw three black men on 8 Mile in the median—two were facing east and one was facing west. (Id. at 153.) Rescoe observed one man hold out a big handgun and made the man facing east lay on the ground. (Id. at 154.) The man with the gun had on a light-colored sweatshirt. The other man wore dark clothing, was just standing there, and had nothing in his hands. (Id. at 155, 157.)

The man placed the gun back in his light-colored sweatshirt and started walking in the opposite direction of the man that had been on the ground. Rescoe thought it was over, but then he saw a man with no shirt come out on Freeland. (Id. at 158.) The man with no shirt was talking to the man with the gun and the other man with him. (Id. at 159.) Words were exchanged between both sides. The men were walking away and, when Rescoe was not looking, he heard a gunshot. The sound made him look towards the two men because he knew one had a gun. (Id. at 160.) The two men were "back peddling" and Rescoe saw the man with no shirt laying on the ground. Rescoe called 911 and observed the two men running down 8 Mile and then down an alley. Rescoe did not see who had fired the gun. (Id. at 161.)

Kevin Maples testified that on April 8, 2011 at approximately 6:30 or 6:45 p.m. he was on 8 Mile eastbound between Greenfield and Coolidge heading home. (Id. at

4

187–88.) Maples observed three men on the island—two of the men were walking towards the third man who got down on his knees. The shorter man, that was wearing a gray sweatshirt, had a gun in his hand. The gun was a "pretty big gun." Maples was driving in the fast lane closest to the island. (Id. at 188–89.) The man on his knees was facing east. (Id. at 190.) Maples called 911. (Id. at 191.)

Jaya Hamilton testified that on April 8, 2011, she was 12 years old and lived with her mother, Annie Hamilton, on Kipling in Oak Park. (Id. at 201–04.) On April 8 in the evening, Jaya went with Jasmine (her sister), Antoine, her cousins, and her brother and sister to the Oak Liquor store. (Id. at 208–10.) As they were returning to the house, one man wearing all black and one man wearing all gray were approaching them. Jasmine told Jaya to get off the street. Antoine ran in the house. Jasmine was screaming "Antoine" and ran to the side of the house. (Id. at 210–11.)

The man in the black hoodie stood on the sidewalk and the man in the gray hoodie chased Jasmine down. The man in the gray hoodie hit Jasmine in the head with a closed fist, told her to shut up, and called her a bitch. Jasmine was pregnant at the time. (Id. at 213–14.) Jasmine was crying and screaming, "[G]et my mama, go get my mama." (Id. at 217.) Jaya ran to get her mother. Her mother came out of the house and Jaya stayed in the house. (Id. at 217.) Jaya was scared and thought they were coming for her next. (Id. at 218.)

Antoine Powe testified that on April 8, 2011 at approximately 6:30 p.m. he was with his girlfriend, Jasmine Hamilton. Powe lived with his godmother, Julie, in the house next door to Jasmine. (Id. at 238–39.) Powe went with Jasmine and some of her nieces, nephews, brothers, and sisters to Oak Liquor for pop, candy, and chips. (Id. at 239.)

As they were all walking back from the store, Powe heard something behind him and turned around. David Jessie and another man were behind him. Jessie pulled a gun out on Powe and said "what up." (Id. at 241, 243.) Powe identified Jessie in court as David Jessie. (Id. at 242.) Jessie was wearing a gray hoodie with black writing. The other man was wearing a black hoodie and the hoodie was up. (Id. at 242.) Jessie's gun was silver and kind of small. The man in the black hoodie pulled out a big black gun and pointed the gun down at his side. (Id. at 243.) Jessie had the silver gun pointed at Powe and Powe ran because he feared for his life. (Id. at 244.)

Powe ran into Julie's house and told them Jessie was out there. Powe heard Jasmine scream and Tony ran out the door, and then Gray ran out followed by Powe and then Trier. (Id. at 247.) Powe told them not to go out because Jessie had a gun. (Id. at 248–49.) Tony and Gray ran to the corner. Jessie and the other man ran across the street in front of the cars. (Id. at 249.) As Powe and Trier ran down to the corner

of Kipling, he saw Tony fall to the ground. Jessie and the man in the black hoodie ran to the Detroit side. Powe was not able to see what had happened because he arrived a little bit later. (Id. at 249–51.)

On cross-examination, Powe stated in July of 2010 something occurred between Jasmine and Jessie at a store, but Powe was not present when "they got into it." (Id. at 257.) Jasmine and Jessie went to high school together. (Id. at 258.) Powe made it clear to the police that he saw two guns. (Id. at 259.) Powe agreed that he testified at the preliminary examination that Huff was the first one to pull out a gun, and then Jessie pulled out a little silver gun. (Id. at 268–70.)

Darryl Gray testified that on April 8, 2011, he was living with Smith, Tony, and Trier. At approximately 6:30 p.m., Powe entered the house and said, "They hit Jasmine." (T Id. at 296–97.) Gray ran outside and saw the kids looking at Jasmine hurt on the ground. Gray saw two men running away—a person in a gray hoodie and dark pants and another person in a black hoodie and "blueish" jeans. (Id. at 298–99.) Gray took off running after them. (Id. at 300–01.) Tony ran behind him. They both crossed 8 Mile. (Id. at 302.) Tony pointed the men out and Gray started walking towards the men with the hoodies. (Id. at 303.) The men crossed over to the median and Gray followed them and was going to ask them what was going on. (Id. at 304–05.)

The man in the gray hoodie pulled out a big black gun and pointed it at Gray, telling him to get on the ground and spread out. Gray thought he was about to die at that point. The man in the gray hoodie checked Gray out to see if he had anything on him and then started to walk away. (Id. at 306–07.) Gray identified Jessie in court as the man who pulled the gun on him. (Id. at 308–09.) Gray started to walk back towards the chiropractor on 8 Mile and then he was running towards Tony. Gray looked back and saw Jessie holding the gun again and it was pointed at Tony. Gray tried to grab Tony, but Tony turned around to pick up his shirt. (Id. at 310–11.) Gray heard a gunshot go off and saw Tony spin and fall to the ground. Tony was about ten feet away from Gray. (Id. at 312–13.) Gray saw a gunshot to Tony's head and the men running to the Detroit side of 8 Mile. (Id. at 314.) Police and emergency medical services (EMS) arrived. (Id. at 315.)

Gray participated in a show-up and identified the man in the black hoodie. Gray was hesitant to continue, but he wore a mask for the identification of the second man, Jessie. Jessie was wearing a black t-shirt and not a gray hoodie at the time of the show-up. (Id. at 319– 21.) At the preliminary examination, Gray testified that he had not done a second show-up. Gray explained that he did not know why he said that, he "just couldn't think no more." (Id. at 322.)

On cross-examination, Gray stated that he did not know who Jessie was at the time

6

of the incident. (Id. at 331.) However, Gray knew that Tony was on probation for having assaulted Jessie. (Id. at 332.) Gray said he was angry and "heated" when he ran after the men in hoodies. (Id. at 334.) The men looked terrified and shocked when Gray and Tony caught up with them. (Id. at 339–40.) Gray knew the men by the clothing they were wearing. (Id. at 343–44.) No one discussed with Gray anything about fingerprints found on the gun. (Id. at 352.) Gray told the police that he was not one-hundred percent sure who was the shooter. (Id. at 362–63.) In Gray's written statement to police, he stated that the guy in the black was turning away with a smoked gun. (Id. at 368.) Gray never saw anyone pass the gun. (Id. at 372.)

Marcia Rodgers testified that on April 8, 2011 at approximately 6:40 p.m. she was driving north on Strathmoor to 8 Mile Road. (5/16/12 Trial Tr. at 4–6.) An elderly lady across the street with bags in her hand caught her attention. The lady was moving really fast and looking towards 8 Mile. (Id. at 10.) Rodgers looked to see where the lady was looking and she saw two black males walking together. Then the men started walking "real fast, and the "heavyset guy took off his jacket and his hat and he dropped it." (Id. at 12.) The items were discarded on the east side of the street, the fourth or fifth house off the alley of 8 Mile Road. (Id. at 23.) The heavier male was wearing a gray jacket, gray hat, black shirt, and black pants. The other man had on a three-quarter length black jacket. (Id. at 15.) The heavier male's t-shirt had white writing on it. (Id. at 17–18.)

Rodgers saw the men running and the one in the black jacket stopped right at her driver side door. She observed a gun in the front part of his pants. (Id. at 19–20.) The gun was black and approximately nine inches. (Id. at 48.) The men kept running westbound. (Id. at 22.) After the men turned, Rodgers had a panic attack. (Id. at 49.)

Ernestine Blair testified that she lived on Strathmoor in Detroit, seven houses from 8 Mile Road. (Id. at 62–63.) On April 8, 2011, at approximately 6:30 p.m. she noticed two black men running down the street on the other side and one took off his cap and threw it on the ground. The other man took off his jacket and threw it on the ground. (Id. at 63–64.) Blair could not tell what color the items were or what they looked like. (Id. at 66.)

Ruth Smith testified that she lived on Hubbell in Detroit, half a mile away from 8 Mile Road. (Id. at 84–86.) On April 8, 2011 at approximately 6:45 p.m., Ruth saw two men run across the grass and into the next-door neighbor's yard. (Id. at 86.) Ruth did not get a good look at the men because her dog in the backyard started barking. Ruth went around back and yelled to the two men to get out of the yard and one of the men said, "[H]ow you doing, ma'am." (Id. at 89–90.) Ruth could not see the men because there was a privacy fence. (Id. at 91.) Ruth's son said something to her and there were police everywhere so she waved her hands and

pointed to the yard next door to let them know those were probably the men they were looking for. (Id. at 92.)

Ruth observed a police officer go up the neighbor's driveway and one of the men came out with his hands up and the other man "just casually put his hands in his pocket and walked north - - walked south on Hubbell." (5/15/12 Trial Tr. at 95.) Smith did not recall what the man was wearing who came out with his hands up. He looked scared. (Id. at 96.) Ten minutes after the police apprehended the first man, Ruth notified the officer that the other man walked out of the yard and she pointed in the direction that he went. (Id. at 98.) The first man was a black male, but Smith could not tell the race of the other man because he had his back to her. (5/16/12 Trial Tr. at 100.)

Jasmine Hamilton testified that she was twenty years old and had eight brothers and sisters. (Id. at 130.) In April of 2011, she lived on Kipling in Oak Park with her mother, Annie Pittman. Her house was the second house off the corner of 8 Mile Road. (Id. at 131.)

On April 8, 2011, at approximately 6:30 p.m., Jasmine went to the store with Powe, her brother, sisters, nieces, and nephews ranging in age from twelve to three years old. (Id. at 132–34.) As they returned from the store and were on Kipling, "some guys ran up on us when our backs were turned." (Id. at 135.) Jasmine recognized David from her ninth grade year at Oak Park High. (Id. at 136.) Jasmine identified Jessie in court as David. The other man with Jessie was a medium-sized black male and Jasmine did not know him. (Id. at 137–38.)

Jasmine recalled that both men were wearing hoodies. Jessie said "what's up" to Powe. (Id. at 138.) Jasmine stated that the other man had pulled out a long black handgun and that was when she yelled to the kids to get in the house. (Id. at 144.) Powe ran to the Cochrane house. Jessie grabbed Jasmine's wrist and she pulled it away. Jasmine ran up the driveway and Jessie grabbed her again by the arm and chased her up the driveway. Jasmine screamed for her mom and Powe and Jessie said "shut up bitch." The children ran to her mother's house. (Id. at 139–40.) Jasmine was scared and feared for her baby's life as well as her own. Jasmine was approximately six months pregnant at the time. (Id. at 141.)

Jessie hit Jasmine in the head with a black object and threw her to the ground. (Id. at 142.) As Jasmine got up, she saw Tony run past her in the direction of 8 Mile Road. Jasmine's mother called 911. Jasmine had a lot of pain on the right side of her head and feared that she would have a miscarriage. (Id. at 145–46, 153.) Jasmine went to the hospital in an ambulance. (Id. at 148.) A picture of Jasmine taken at the hospital shortly after the incident was admitted as People's exhibit 18. (Id. at 151–53.) Jasmine refreshed her recollection with her written statement to

8

police and stated that Jessie was wearing a gray hoodie and the other male was wearing a black hoodie. (Id. at 150–51.)

In July of 2010, Jessie said something inappropriate and disrespectful to Jasmine at the Oak Liquor Store. (Id. at 146.) Jasmine told Tony about it, and there was an altercation. Tony was charged with assault and battery and pled guilty to that charge. (Id. at 147.)

On cross-examination, Jasmine stated that the only person she saw with a gun was the other man, not Jessie. (Id. at 161–62.) Jasmine wrote in her statement that the man in the gray hoodie was the person that pulled out a gun and Jessie was wearing a black hoodie. (Id. at 163, 166.) Jasmine's written statement was admitted as defense exhibit C. (Id. at 167.) Jasmine was very close with Tony and Trier and called them her brothers. (Id. at 173.)

Jasmine was unclear which man had on which hoodie. (5/17/12 Trial Tr. at 5.) Jasmine testified at the preliminary examination on May 20, 2011, that she was sure Jessie had on a black hoodie and the other man had on a gray hoodie. (Id. at 7–8.) The 911 call that Jasmine's mother made that night was played for the jury. (Id. at 24.) In the background of the call, Jasmine told her mother that it was not Jessie that had the gun, but the other boy. (Id. at 24.)

Regarding the July 2010 incident, Jasmine stated that she went to Oak Liquor Store with Powe and Jessie said something to Jasmine that made her feel disrespected. (Id. at 14–15.) Jasmine told her brother, Terry Field, what happened. Terry, Tony, and Trier returned to the store and later Jasmine found out that all three were arrested for assaulting Jessie. (Id. at 17–19.)

Jon Lences, an Oak Park police officer, testified that on April 8, 2011, he received a dispatch that a pregnant woman was being assaulted. (Id. at 32–33.) When Lences arrived at the house on Kipling in Oak Park, the scene was chaotic. Lences spoke with Jasmine, the victim of the assault, and observed that she was very disoriented and she was crying, very confused. (Id. at 35–36.) Jasmine had a lump above her right temple. It was hard to get information from Jasmine because she appeared "shocked." (Id. at 38.) Jasmine was taken to Providence Hospital in Southfield. (Id. at 39.) Lences spoke with Jasmine at the hospital. She still appeared dazed and very confused. (Id. at 40.) Lences also spoke with Jaya, Yana, and Tyler Hamilton. (Id. at 42.)

On cross-examination, Lences stated that Jasmine told him before the ambulance arrived that the subject wearing the gray hoodie was the one that pulled out the gun and Jessie was wearing a black hoodie. (Id. at 50.)

Jim Vernier, an Oak Park police officer, testified that he was dispatched on April

9

8, 2011 at approximately 6:40 p.m. to the corner of 8 Mile and Kipling regarding a possible assault or shooting. (Id. at 59.) Vernier proceeded to the corner of Freeland and 8 Mile and saw an African-American male lying on his back with a gunshot wound to the left side of his head. (Id. at 60–63.) Vernier observed blood and brain matter coming from the wound. (Id. at 64.) A photo of the victim was admitted as People's exhibit 19. (Id. at 67.) Tony, the victim, was pronounced deceased and was covered with a white sheet. (Id. at 69.) Vernier spoke to various witnesses at the scene. (Id. at 79–80.)

Eric Zarfl, an Oak Park police officer, testified that he received many dispatches on April 8, 2011, regarding (1) a male assaulting a pregnant female, (2) an argument in the median of 8 Mile, (3) a man had a person down on the ground with a gun, (4) a man had been shot, and (5) the suspects were running westbound on 8 Mile. (Id. at 104–06.) The suspects were described as two black males, both wearing jeans, one with a gray hoodie and the other with a black shirt or jacket.

A resident at Norfolk and Hubbell was trying to get Zarfl's attention. (Id. at 108.) Zarfl parked his car and saw two black males coming out of the yard, one directly towards his patrol car and the other walked south on Hubbell. (Id. at 111.) The man that walked towards Zarfl walked rapidly and had a black coat with a black shirt under it. Zarfl learned his name was Djuamiel Huff. The one that walked away slowly was wearing jeans and a black shirt. (Id. at 112–14.)

Huff told Zarfl that "he needed to get out of there. He had to go. I needed to take him out of there. We got to go. We got to leave this area." (Id. at 114.) Huff told Zarfl that he was being chased with somebody with a gun. (Id. at 116.) Zarfl placed Huff in his patrol car. Huff wanted to get in the car. (Id. at 117–18.) Zarfl radioed other officers about the second person walking south on Hubbell. (Id. at 118–19.) Zarfl spoke with Ruth Smith and later received information that a gun was found on the garage roof of the house just south of where the men exited the yard. (Id. at 119–21.)

Frank Slone, an Oak Park lieutenant, testified that he had a dispatch of a person shot on 8 Mile. A man located near Northland Chrysler provided Slone with a description of the suspects. (Id. at 152–55.) Slone went down Hubbell and was flagged down by a man in a red car. Based on the conversation with the man, Slone gave information on the dispatch that a woman with a German Shepard on Norfolk had information that two suspects went running into a backyard. (Id. at 156–57.)

As Slone was returning to assist Zarfl on Hubbell, he noticed that a young man was walking, and unlike others who were staring at him to see what was going on, this man was staring away and was not wearing a jacket like everyone else in the area. (Id. at 160.) Slone asked the man to stop and he came around and was polite. Slone

identified Jessie in court as the person he stopped. (Id. at 161.) A photo of Jessie of how he looked when he was stopped by Slone was admitted as People's exhibit 27. (Id. at 162.)

Slone patted down Jessie and noticed that he was drenched with sweat. (Id. at 163.) Slone found a little lighter that looked like a small caliber automatic handgun in Jessie's right front pants pocket. It was small enough to fit in the hand. (Id. at 164.) Jessie was apprehended approximately a block and a half away from where Zarfl apprehended Huff. (Id. at 167.)

Slone returned to assist Zarfl and noticed that Huff was speaking on his cell phone in the back seat of the patrol car. Huff told Slone he was speaking to his mother. Two minutes later, Huff's mother showed up. (Id. at 168.) Huff's mother was respectful and asked what was going on with Huff and his cousin, Jessie. (Id. at 169.)

Slone conducted a show up. Darryl Gray was brought to view the suspects. Gray identified Huff almost immediately. Gray was terrified of Jessie identifying him so the officers allowed him to wear a hood. Gray identified Jessie. Both Huff and Jessie were arrested. (Id. at 173–78.)

Matthew Bruce, an Oak Park police officer and fire officer, testified that on April 8, 2011 at approximately 6:40 p.m. he responded to a dispatch at 8 Mile and Freeland. Bruce observed an unresponsive male subject laying on the ground in a pool of blood. Bruce checked his vitals and there were none. (Id. at 217.) There was a gunshot wound to the top left side of the victim's head. The victim did not have a shirt on and he was laying on his back. (Id. at 218.) Bruce gave the victim CPR while Officer Vernier held back the crowd until Detroit rescue showed up. (Id. at 219.)

Bruce was notified that there was someone running behind him by 8 Mile and Hubbell that had a vested interest in the case. (Id. at 222.) Bruce spotted the subject at 8 Mile and Kipling area. Bruce ordered the man to the ground at gunpoint and the man complied. The man was Darryl Gray Jr. and he was visibly shaken, nervous, and apprehensive. (Id. at 224–26.) Bruce took Gray to a show-up in the area of Norfolk and Hubbell. (Id. at 227.) Huff was wearing a black Carhartt jacket, black hat, and blue jeans. Gray identified Huff as the person with the shooter. (Id. at 230.)

The second person was shown to Gray. Bruce identified Jessie in court as the second person in the show-up. (Id. at 231.) As soon as Gray saw Jessie, he shuttered and tried to duck so he could not be seen. (Id. at 232.) Bruce could not get Gray to calm down so Gray was allowed to wear a fire mask. (Id. at 233.) Gray identified Jessie as the shooter and said he was a hundred percent sure. (Id. at 233–34.) At the

time of the show-up, Jessie was wearing a black shirt with white lettering. (Id. at 234.)

Bruce went to search the area where the subjects were located. He looked up and saw a black revolver laying on the roof at 20196 Hubbell. (Id. at 236.) The gun Bruce found was admitted as People's exhibit 5. (Id. at 237.) The gun was a Dan Wesson .357 caliber. (Id. at 246.)

Brian Bolash, an Oak Park police officer, testified that he was working at the police station when David Jessie was brought in on April 8, 2011. Bolash identified Jessie in court as David Jessie. (Id. at 287–88.) Bolash searched Jessie and found a lighter fashioned as a silver pistol in his right front pants pocket. (Id. at 290.) Huff was brought to the station and he was wearing dark colored pants, a black shirt, and a black Carhartt type coat. (Id. at 292.) Jessie was wearing black pants and a black tee shirt with white lettering. (Id. at 292–94.) Bolash found a blue nylon type bag in Huff's right breast coat pocket containing three .38 caliber rounds. (Id. at 296–98.)

Doctor Bernardino Pacris, a deputy medical examiner with Oakland County, was qualified by the court as an expert in forensic pathology. (Id. at 315.) Pacris testified that he performed an autopsy on Tony Lamarr Cochrane, Jr. (Id. at 317.) Pacris' autopsy report was admitted as People's exhibit 45. (Id. at 318.) Pacris observed a gunshot wound to the left side of Tony's head. (Id. at 319.) The bullet perforated the skull and the brain and Pacris recovered the bullet inside Tony's brain. (Id. at 320.) The bullet was given to an Oak Park police officer ballistic expert. (Id. at 326.) Tony was a healthy young man and the cause of death was the gunshot wound to the head. The manner of death was homicide. (Id. at 326–27.) A toxicology test was performed and Pacris stated that five nanograms of THC (a metabolite of marijuana) were found in Tony's system. (Id. at 335.)

* * *

Erik Sanders, an Oak Park police officer, testified that on April 8, 2011, at approximately 6:40 p.m. he was dispatched to the area of Norfolk and Hubbell Street and as he arrived, Zarfl was already there, stopping a man coming out of a yard. (Id. at 29–32.) There were actually two black men—one wearing a black coat and dark pants that approached Zarfl and the other wearing a black shirt and dark pants that walked southbound on Hubbell. (Id. at 32–33.) The man that approached Zarfl was excited and started to scream that the officers had to get him out of there because two men were trying to kill him. The man attempted to enter both patrol cars. (Id. at 34.) Zarfl searched the man, who turned out to be Huff, and allowed Huff to sit in Zarfl's patrol car. (Id. at 35.) Sanders notified other officers about the second man walking down the street. (Id. at 36.)

Sanders proceeded to 20731 Kipling where the scene was chaotic. As he was

12

tending to Jasmine, Gray returned. (Id. at 37–39.) Sanders spoke with Gray and he was very upset, going from "anger to sadness to crying to - - back to anger; you name an emotion he had it." (Id. at 38.) After speaking with Gray, Sanders responded back to Hubbell and Norfolk. (Id. at 39.) The two men were together in the back of the patrol car so he separated them. Sanders identified Jessie in court as one of the two men he separated. (Id. at 40.) Sanders participated in the show-up with Gray and the two men, Jessie and Huff. (Id. at 42–44.) Sanders stated that he saw Jessie trying to contort his face during the show-up. (Id. at 46.)

Robert Koch, an Oak Park detective, testified that he was called back to the station on April 8, 2011, at approximately 7:00 p.m. to investigate a shooting. (Id. at 67.) Koch photographed Jessie and Huff in the clothing they wore when they were brought to the station. (Id. at 68.) Koch identified Jessie in court as Jessie. (Id. at 69.)

Michael Pousak, a detective lieutenant with the City of Oak Park, testified that he was in charge of the investigation in this case. (Id. at 80.) On April 8, 2011, Pousak went to 8 Mile and Freeland to ensure that the evidence was being protected. (Id. at 83.) Pousak spoke with Marcia Rodgers at the station that evening. (Id. at 84–85.) Pousak spoke with Ernestine Blair at her home and she wrote out a statement. (Id. at 85.) Pousak stated that it was not a normal practice to do a gunshot residue test due to unreliability and the fact that there were eyewitnesses in this case. Pousak had information that the gun had been passed. (Id. at 86.)

Doris Butler testified that she was the mother of Djuamiel Huff and that David Jessie was Butler's cousin. Butler identified Jessie in court as David Jessie. (Id. at 123–24.) Butler stated that she bought her son a black hooded Carhartt jacket in November of 2010. (Id. at 127–28.) Butler said Huff wore a hat with a D on it frequently. (Id. at 129.) On the evening of April 8, 2011, Butler dropped Huff and Jessie off at Greenfield between 8 and 9 Mile Roads. Later, Butler received a call from Huff and he sounded hysterical, stating that he needed her to come now and "they trying to kill us." (Id. at 131–33.) Huff told Butler that he was in the back of a police car and guided her to find him. (Id. at 134.) When she got there, the police told Butler they were taking Huff to the police station. (Id. at 136.) In October of 2011, Huff was sentenced to accessory after the fact of a felony and possession of a firearm. After sentencing, Butler spoke with the prosecutor that Huff was willing to testify. (Id. at 137.) Butler and Huff were not promised anything for their testimony in this case. (Id. at 162–63.)

Robert Charlton, a firearm and toolmark examiner with the Oakland County Sheriff's Office, was qualified by the court as an expert in firearms identification. (5/21/12 Trial Tr. at 13.) On April 8, 2011, Charlton collected a hat and jacket located at 20468 Strathmoor. (Id. at 20–22.) Charlton identified the fitted ball cap

and it was admitted as People's exhibit 59. Charlton also identified the gray hoodie jacket which was previously admitted as People's exhibit 13. (Id. at 24–25.)

Charlton recovered a firearm from the garage at 20196 Hubbell. (Id. at 26–27.) The firearm had one fired cartridge case under the hammer and five other live cartridges still in the cylinder. (Id. at 29.) The firearm was functional. (Id. at 35.) Charlton was given a bullet from the medical examiner's office and, after performing repeatability tests, was able to conclude that the fired bullet from the medical examiner's office was fired through the barrel of the Dan Wesson revolver recovered on Hubbell. (Id. at 37–38.) Charlton found that from where the victim was found to where the shooting occurred was 185 feet. (Id. at 49.)

Nichole Christensen, a forensic laboratory specialist with the Oakland County Sheriff's Office, was qualified by the court as an expert in fingerprint analysis and fingerprint collection. (Id. at 81.) Christensen processed a Dan Wesson Arms .357 Magnum revolver for fingerprints and found one latent fingerprint from underneath the cylinder of the revolver. (Id. at 89–90.) Christensen compared the latent fingerprint to known prints of Jessie and Huff. The latent print belonged to Huff. (Id. at 98.) The latent fingerprint was not in a shooter's position. (Id. at 99.)

Djuamiel Huff testified that he was nineteen years old. In April of 2011, Huff lived in Detroit with his mother, Doris Butler. (Id. at 116.) On April 8, 2011 at approximately 6:00 p.m., Huff and David Jessie, his cousin, got a ride from Butler to Northland Mall. Huff identified Jessie in court as Jessie. (Id. at 118–19.) Huff and Jessie stayed at the mall awhile and then headed to 8 Mile and Schaefer, which was Jessie's mother's house.

Jessie had a .357 pistol tucked in his belt. (Id. at 120.) Huff went half and half with Jessie on the purchase of the pistol three weeks before the incident. (Id. at 122.) Huff had the bullets in his back pocket and later moved them to his coat pocket. (Id. at 124–25.) Huff was wearing a black Carhartt coat and a Detroit hat. (Id. at 126.) Jessie was wearing a gray hat and gray coat. (Id. at 127.)

As they were walking in the area of 8 Mile and Kipling, Jessie stopped and said, "[T]here she go." Jessie passed the gun to Huff and told him to hold it. Huff put it up his sleeve. (Id. at 131.) Jessie ran across the street and hit a girl and both Jessie and Huff took off running. (Id. at 127.) Huff and Jessie started walking westbound on 8 Mile and Huff gave Jessie the gun back because he was concerned about the whole situation.

As they crossed over the median, a black male wearing all black ran up to them. (Id. at 133, 138.) Jessie pulled the gun on the man. Jessie told the man to "get the F[uck] on the ground." The man put his hands up, got on his knees, and laid face down. Huff was watching but walking backwards. (Id. at 138.) Jessie pointed the

gun in the man's face and then began to walk off. (Id. at 139.) Huff was angry because he felt the pulling of a gun in public was unnecessary. (Id. at 140,) Huff and Jessie got in a little argument and a little tug of war with the gun and Huff let go.

Huff started walking and looked back at Jessie. Jessie was aiming the gun with both hands at the shirtless, light-skinned man across the street (not the man that was in the median held at gunpoint). (Id. at 142–43.) Jessie and the light-skinned man were yelling at each other. The light-skinned man took one step and Huff heard the gun go off. Huff saw the smoke and saw the man fall. (Id. at 144.)

Huff immediately took off running and Jessie followed him. They went westbound on 8 Mile Road. Huff was afraid of what Jessie would do with the gun so he took it from him. (Id. at 145–47.) Jessie threw his hat and jacket to the ground on Strathmoor. (Id. at 148.) Huff and Jessie went into a backyard on Hubbell Street. (Id.) Huff gave Jessie the gun and Jessie threw it to the other side of the fence. A woman said "what are you all doing" and they started to leave the backyard. (Id. at 150–51.) Huff waved down a police officer and Jessie was walking down Hubbell. (Id. at 152.) Huff was arrested. (Id. at 154.)

Trier Cochrane testified that on April 8, 2011 he heard screaming and then Tony and Gray got up and ran out of the house and Trier was behind them. (5/22/12 Trial Tr. at 10.) Trier saw Tony and Gray chasing two guys—one wearing a black hoodie and one wearing a gray hoodie. (Id. at 12–13.) Jessie had on the gray hoodie. A few minutes later, Powe told Trier that he saw Tony laying on the ground. Trier got in his car and drove to the scene. (Id. at 13–14.) Trier did not recall driving over a median. (Id. at 19.) From when Trier saw Tony chasing the two guys and when Powe came back was about five minutes in duration. (Id. at 23.)

Trier knew Jessie from an altercation that took place in July of 2010. Someone told Trier that Jessie had touched Jasmine's butt at the liquor store. (Id. at 15–16.) Trier, Tony, and a person name TJ went to the store to fight. (Id. at 16.)

The defense recalled Darryl Gray. Gray never told the police he was one hundred percent sure who the shooter was. (Id. at 28.) Gray was confused because they [the two suspects] were both wearing black at the time of the show-up. (Id. at 29.) Gray did not recall if Jessie made any verbal threats to him when he had the gun pointed at him. (Id. at 32.) In Gray's written statement, he said that the other guy (not the guy in the gray hoodie) was holding a "smoked" gun after he heard the gunshot. (Id. at 45.)

On cross-examination, Gray stated that his written statement was out of order. (Id. at 49.) Gray explained that he saw Jessie aim the gun and he tried to get Tony to

go. Then Gray heard the gunshot and, moments later, saw Jessie and Huff running away and the one in the black hoodie was holding the gun by the barrel. (Id. at 54–55.)

Jessie chose to testify. Jessie stated that he went to Huff's house on April 8, 2011 at approximately 1:00 p.m. (Id. at 77–78.) Jessie denied part-ownership of a .357 Magnum revolver and knew that Huff had a gun on him on that day. (Id. at 79.) Jessie denied ever touching Huff's gun. (Id. at 81.) Jessie and Huff got dropped off at 9 Mile and Greenfield. They walked back to Jessie's grandmother's house.

As Jessie and Huff were walking, Jessie saw Jasmine walking with a young man and some kids. Jessie did not notice that Jasmine was pregnant because she had on a big coat. (Id. at 84–93.) Jessie denied having or touching the .357 revolver at the time. Jessie said "what's up now" to Antoine and was ready to fight him. (Id. at 94.) Antoine immediately ran and Jessie hit Jasmine because he was mad that she got him jumped. Jessie immediately ran and when he got to 8 Mile, he saw four guys going after him. (Id. at 95–96.)

Jessie and Huff ended up in the median of 8 Mile and Gray went out to the median. Jessie was scared and pulled out his silver lighter that looked like a gun and told Gray to stop. (Id. at 98–100.) Jessie started walking backwards and Gray crossed back over the street. (Id. at 101.) Jessie saw Huff pull his gun out and aim it. Jessie heard the gunshot, but he did not see the shot fired. (Id. at 102–03.)

Jessie and Huff immediately ran through an alley. Jessie was wearing all black, a gray hat, and a gray hoodie. Jessie dropped the hat and hoodie. (Id. at 104–05.) Jessie and Huff went to a backyard on Hubbell and Jessie saw Huff throw the gun on top of the roof. (Id. at 108–10.) The police arrived and Huff ran to them with his hands up. Jessie just kept walking in fear. (Id. at 110.) When a police officer stopped him farther down, Jessie complied. (Id. at 111–12.) Jessie stated that he cooperated in the show-up and denied contorting his face. (Id. at 113.) Jessie denied shooting Tony. (Id. at 122.)

In 2010, Jessie said something to Jasmine about her weight and she felt disrespected. Jessie was later assaulted at the liquor store by ten unknown men. (Id. at 87–91.) Tony Cochrane and Trier Cochrane were two of the men who assaulted Jessie. (Id. at 91.)

On cross-examination, Jessie admitted that he was thinking about revenge when he saw Jasmine and did not like Tony or Trier because they jumped Jessie. (Id. at 122.) Jessie wanted to get even. (Id. at 123.) Huff did not know Jasmine or Tony or Trier. (Id. at 123–24.) Jessie agreed that the gun lighter was barely visible when he held it with two hands. (Id. at 126.) Jessie denied having anything in his hand when he

punched Jasmine and Antoine was lying that he had a silver gun out at that time. (Id. at 130.) Jessie denied saying bitch to Jasmine or grabbing her or throwing her down. (Id. at 131–32.) Jessie agreed that he was the only person that pulled anything on Gray so nobody would have seen the big black gun being pointed at Gray with his hands up and laying on the grass. (Id. at 165–66.)

Resp. Answer at PageID.310–343 (Dkt. 10).

Following his convictions and sentencing, Petitioner filed an appeal of right with the Michigan Court of Appeals raising claims concerning judicial bias, the jury instructions, the conduct of the prosecutor, the effectiveness of trial counsel, the validity of his sentences. The Michigan Court of Appeals denied relief on those claims and affirmed his convictions and sentences. Jessie, 2014 WL 2751047, at *1–*10. Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which reversed in part and remanded the case to the trial court to determine whether the court would have imposed a materially different sentence under the sentencing procedure described in People v. Lockridge, 870 N.W.2d 502 (Mich. 2015), but denied leave to appeal as to the other claims. People v. Jessie, 870 N.W.2d 713 (Mich. 2015).

On remand, the trial court ruled that it would have imposed the same sentences absent the constitutional violation, declined to re-sentence Petitioner, and affirmed his original sentences. People v. Jessie, No. 11-237057-FC at *1–*2, (Aug. 31, 2016). Petitioner filed an appeal of right with the Michigan Court of Appeals, which affirmed his sentences. People v. Jessie, No. 335255, 2018 WL 521971 (Mich. Ct. App. Jan. 23, 2018) (unpublished). Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was denied in a standard order. People v. Jessie, 933 N.W.2d 294 (Mich. 2019).

Petitioner thereafter filed his federal habeas petition, as amended/supplemented. He raises the following claims:

I.      The lower court erred in holding that the trial court had not violated Petitioner's due process right to a fair trial and to a properly instructed jury, or that the trial court had pierced the veil of judicial impartiality through his comments and instructions to the jury that improperly bolstered the credibility of the prosecution's key witness.

II.     The lower court erred in holding that plain error was not committed by the failure to instruct the jury on the factually-supported lesser included offense of involuntary manslaughter.

III.    The lower court erred in holding that no prosecutorial misconduct in closing argument deprived Petitioner of his due process right to a fair trial.

IV.     The lower court erred in holding that Petitioner was not denied his Sixth Amendment right to the effective assistance of counsel at trial.

V.      The lower court erred in holding that the trial court properly scored offense variables 3, 14, and 19 in calculating Petitioner's sentence range under the guidelines.

VI.     Re-sentencing is required where Petitioner's sentence was increased based on facts that were not found by a jury or proved beyond a reasonable doubt in violation of the Fifth and Sixth Amendments to the United States Constitution.

VII.    The Michigan Court of Appeals unreasonably determined that Darryl Gray identified Petitioner as the shooter and trial counsel was ineffective for failing to argue to the jury that Gray did not identify Petitioner as the shooter.

Respondent has filed an answer to the habeas petition contending that it should be denied because certain claims are waived and/or procedurally defaulted, one claim is unexhausted, and all of the claims lack merit.

## II.     STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 et seq., sets forth the standard of review that federal courts must use when considering habeas petitions brought by prisoners challenging their state court convictions.   The AEDPA provides in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'"   Mitchell v. Esparza, 540 U.S. 12, 15–16 (2003) (per curiam) (quoting Williams v. Taylor, 529 U.S. 362, 405–406 (2000)); see also Bell v. Cone, 535 U.S. 685, 694 (2002).   "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case."   Wiggins v. Smith, 539 U.S. 510, 520 (2003) (quoting Williams,

19

529 U.S. at 413); see also Bell, 535 U.S. at 694.   However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.   The state court's application must have been 'objectively unreasonable.'"   Wiggins, 539 U.S. at 520-521 (citations omitted); see also Williams, 529 U.S. at 409.   The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' Lindh, 521 U.S. 320, 333 n. 7 (1997), and 'demands that state-court decisions be given the benefit of the doubt,' Woodford v. Viscotti, 537 U.S. 19, 24 (2002) (per curiam)."   Renico v. Lett, 559 U.S. 766, 773 (2010).

Pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court.   Harrington v. Richter, 562 U.S. 86, 102 (2011).   The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."   Id. (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)).   Thus, in order to obtain habeas relief in federal court, a state prisoner must show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."   Id. at 103; see also White v. Woodall, 572 U.S. 415, 419–420 (2014).   Federal judges "are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong."   Woods v. Donald, 575 U.S. 312, 316 (2015).   A habeas petitioner cannot prevail as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable.   Woods v. Etherton,

20

578 U.S. 113, 118 (2016).

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision.  Williams, 529 U.S. at 412; see also Knowles v. Mirzayance, 556 U.S. 111, 122 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of' 'clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting Wright v. Van Patten, 552 U.S. 120, 125–126 (2008) (per curiam)); Lockyer, 538 U.S. at 71–72 (2003).   Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"   Harrington, 562 U.S. at 100.   Furthermore, it "does not require citation of [Supreme Court] cases—indeed, it does not even require awareness of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."   Early v. Packer, 537 U.S. 3, 8 (2002) (emphasis in original); see also Mitchell, 540 U.S. at 16.   The requirements of clearly established law are to be determined solely by Supreme Court precedent.   Thus, "circuit precedent does not constitute clearly established Federal law as determined by the Supreme Court" and it cannot provide the basis for federal habeas relief.   Parker v. Matthews, 567 U.S. 37, 48–49 (2012) (per curiam); see also Lopez v. Smith, 574 U.S. 1, 2 (2014) (per curiam).   The decisions of lower federal courts, however, may be useful in "assessing the reasonableness of the state court's resolution of an issue."   Stewart v. Erwin, 503 F.3d 488, 493 (6th Cir. 2007) (citing Williams v. Bowersox, 340 F.3d 667, 671 (8th Cir. 2003)); Dickens v. Jones, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002).

A state court's factual determinations are presumed correct on federal habeas review.   See 28 U.S.C. § 2254(e)(1).   A habeas petitioner may rebut this presumption only with clear and convincing evidence.   Warren v. Smith, 161 F.3d 358, 360–361 (6th Cir. 1998).   Moreover, habeas review is "limited to the record that was before the state court."   Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

## III.   DISCUSSION

### A.   Waiver, Exhaustion, Procedural Default

As an initial matter, Respondent contends that several of Petitioner's habeas claims are waived, unexhausted, and/or barred by procedural default.   The Court declines to address such defenses.   A prisoner filing a petition for a writ of habeas corpus under 28 U.S.C. § 2254 must first exhaust all state remedies.   28 U.S.C. §§ 2254(b)(1)(A) and (c); O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."); Rust v. Zent, 17 F.3d 155, 160 (6th Cir. 1994).   While the exhaustion requirement is strictly enforced, it is not a jurisdictional prerequisite for bringing a habeas petition. Granberry v. Greer, 481 U.S. 129, 134–135 (1987).   For example, an unexhausted claim may be addressed if pursuit of a state court remedy would be futile, see Witzke v. Withrow, 702 F. Supp. 1338, 1348 (W.D. Mich. 1988), or if the unexhausted claim is meritless such that addressing it would be efficient and not offend federal-state comity.   See Prather v. Rees, 822 F.2d 1418, 1422 (6th Cir. 1987); 28 U.S.C. § 2254(b)(2) (habeas petition may be denied on merits despite failure to exhaust state court remedies).   Such is the case here.

Additionally, while a waiver or a state procedural default can, and often should, provide

22

sufficient reason for a federal court to deny habeas relief, see Benton v. Brewer, 942 F.3d 305, 307 (6th Cir. 2019) ("Comity and federalism demand nothing less."), procedural default is not a jurisdictional bar to habeas review.   Howard v. Bouchard, 405 F.3d 459, 476 (6th Cir. 2005). Moreover, federal courts on habeas review "are not required to address a procedural-default issue before deciding against the petitioner on the merits."   Hudson v. Jones, 351 F.3d 212, 215 (6th Cir. 2003) (citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997)); see also Overton v. MaCauley, 822 F. App'x 341, 346 (6th Cir. 2020) ("Although procedural default often appears as a preliminary question, we may decide the merits first.").   The Supreme Court has explained the rationale behind such a policy: "Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."   Lambrix, 520 U.S. at 525.   Such is the case here.   The procedural issues are complex and intertwined with the merits of the ineffective assistance of counsel claim, and the substantive claims are more readily decided on the merits.   Accordingly, the Court shall proceed to the merits of the claims.

      **B.**    **Merits**

           **1.**    **Judicial Bias/Jury Instruction Claim**

Petitioner first asserts that he is entitled to habeas relief because the trial court erred in advising the jury about Djuamiel Huff's Cobbs agreement because, in doing so, the court pierced the veil of judicial impartiality.   Respondent contends that this claim is waived and/or procedurally defaulted and that it lacks merit.

The Due Process Clause of the Fourteenth Amendment requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or an interest in the outcome of the case.

Bracy v. Gramley, 520 U.S. 899, 904–905 (1997).   Judicial misconduct claims involve two types

of cases. One group addresses charges of "judicial bias" stemming from a trial judge's "personal

interest" in the outcome of a case, usually derived from some extrajudicial association with the

cause or one of the parties.   In re Murchison, 349 U.S. 133, 136 (1955).   The second group

concerns charges of "judicial misconduct" in which the trial judge is accused of conducting the

proceedings in a manner that exhibits a "deep-seated favoritism or antagonism that would make

fair judgment impossible."   Liteky v. United States, 510 U.S. 540, 555 (1994); see also Alley v.

Bell, 307 F.3d 380, 386 (6th Cir. 2002).   Adverse rulings themselves are generally insufficient

to establish bias or prejudice.   Liteky, 510 U.S. at 555 ("[J]udicial rulings alone almost never

constitute valid basis for a bias or partiality recusal motion."); United States v. Hynes, 467 F.3d

951, 960 (6th Cir. 2006) (citing Liteky).   A constitutional violation occurs only when a judge's

rulings or statements show "a predisposition so extreme as to display clear inability to render fair

judgment."   Johnson v. Bagley, 544 F.3d 592, 597 (6th Cir. 2008) (punctuation modified).   In

reviewing a judicial bias claim, a federal habeas court should presume that the judge properly

discharged his or her official duties.   Withrow v. Larkin, 421 U.S. 35, 47 (1975); Coley v.

Bagley, 706 F.3d 741, 751 (6th Cir. 2013); Johnson v. Warren, 344 F. Supp. 2d 1081, 1093 (E.D.

Mich. 2004).

The Michigan Court of Appeals denied relief on this claim, explaining in relevant part:

Defendant contends on appeal that the trial court's explanation to the jury of a
Cobbs agreement pierced the veil of judicial impartiality. The court made the
following comments to the jury during the prosecutor's questioning of a
prosecution witness, Djuamiel Huff, regarding Huff's guilty pleas to carrying a
concealed weapon and accessory after the fact:

Ladies and gentlemen, in the process of criminal arraignments and
pleas there is what's called a plea agreement which is between the

People and the defendant.

And there's what's called a <u>Cobbs</u> agreement which is between the Court and the defendant. The Court it pertains to sentencing, okay. The plea bargain may deal with reducing charge and the like.

What he's just described there was a <u>Cobbs</u> agreement with the Court, What he's just described there was a <u>Cobbs</u> agreement with the Court, not with the People.

The trial court's comments to the jury concerning a <u>Cobbs</u> agreement did not pierce the veil of judicial impartiality. In <u>People v. Cobbs</u>, 443 Mich. 276, 283; 505 NW2d 208 (1993), our Supreme Court held that a trial court may provide a preliminary evaluation of the length of a sentence to a defendant who pleads guilty or no contest:

At the request of a party, and not on the judge's own initiative, a judge may state on the record the length of sentence that, on the basis of the information then available to the judge, appears to be appropriate for the charged offense.

\* \* \*

The judge's preliminary evaluation of the case does not bind the judge's sentencing discretion, since additional facts may emerge during later proceedings, in the presentence report, through the allocution afforded to the prosecutor and the victim, or from other sources. However, a defendant who pleads guilty or nolo contendere in reliance upon a judge's preliminary evaluation with regard to an appropriate sentence has an absolute right to withdraw the plea if the judge later determines that the sentence must exceed the preliminary evaluation. [Emphasis removed.]

Here, Huff's testimony initially suggested incorrectly that he had a plea agreement with the prosecutor that "you guys" would sentence Huff within the guidelines. The trial court corrected this misunderstanding for the jury by clarifying that a <u>Cobbs</u> evaluation is provided by the trial court. The prosecutor then followed up with further questioning of Huff establishing that there was no plea agreement with the prosecutor and that Huff was not promised anything in exchange for pleading guilty. By clarifying that defendant's plea was entered following a <u>Cobbs</u> evaluation by the court rather than on the basis of a plea agreement with the prosecutor, the trial court properly exercised reasonable control over the mode of interrogating witnesses and the presentation of evidence to make the interrogation and presentation effective for the ascertainment of truth. <u>See</u> MRE 611(a).

Defendant argues that the trial court improperly suggested to the jury that the

25

court had itself negotiated an agreement with Huff and that the court thereby implicitly signaled a belief in Huff's truthfulness; defendant contends that the court further suggested that Huff gained nothing from the prosecutor, when in fact he avoided murder and assault charges. These arguments lack merit. The trial court made no comment suggesting that it had negotiated an agreement with Huff or that it believed Huff's testimony; the court was merely drawing a distinction between a plea agreement with the prosecutor over reducing charges and a <u>Cobbs</u> evaluation by the trial court regarding a defendant's sentence. Although the trial court arguably could have explained more precisely that a court makes only a preliminary sentencing evaluation under <u>Cobbs</u>, instead of referring to a "<u>Cobbs</u> agreement," the court's terminology did not pierce the veil of judicial impartiality by suggesting a belief in Huff's truthfulness. Further, defendant's contention that the court's comments created a false impression that Huff gained nothing from the prosecutor is devoid of merit. There is no evidence that Huff was promised anything in exchange for his testimony in this case. Huff expressly testified that the prosecutor, the police, and the court made no such promises to him. The suggestion that Huff avoided murder and assault charges by testifying against defendant, and that the court's comments undermined defendant's ability to impeach Huff on this ground, has no support in the record.

Moreover, even if the trial court had implicitly expressed a view regarding Huff's credibility, any prejudice was cured because the trial court instructed the jury:

> My comments, rulings, questions and instructions are not evidence. If you believe I have an opinion about how you should decide this case, you must pay no attention to that opinion. You are the judges of the facts and you decide the facts from the evidence that you've heard presented here in court.

"It is well established that jurors are presumed to follow their instructions." <u>People v. Graves</u>, 458 Mich. 476, 486; 581 NW2d 229 (1998). Thus, any prejudice arising from the court's comments concerning the <u>Cobbs</u> agreement was alleviated. Further, even without Huff's testimony, the evidence against defendant was overwhelming. In addition to Huff, another witness, Darryl Gray, identified defendant as the shooter. Also, multiple independent eyewitnesses identified the shooter as wearing a gray hoodie in the Eight Mile median, and it is undisputed that defendant rather than Huff was the person in the median who was wearing a gray hoodie. Accordingly, defendant has failed to establish that the trial court's conduct or comments unduly influenced the jury and deprived defendant of a fair and impartial trial.

<u>Jessie</u>, 2014 WL 2751047 at *2–*3.

The state court's decision is neither contrary to Supreme Court precedent nor an

unreasonable application of federal law or the facts.  The trial court instructed the jury about Huff's plea to clarify that he entered his plea pursuant to a <u>Cobbs</u> evaluation with the trial court as to sentencing rather than an agreement with the prosecutor for reduced charges or other consideration in exchange for his testimony.  Such statements were a proper exercise of the court's discretion and its authority to control the proceedings.  The trial court did not indicate that the court had negotiated an agreement with Huff or that the court found his testimony to be credible.  Additionally, the trial court instructed the jurors that its own comments, rulings, and instructions are not evidence and that they should disregard any beliefs about the court's opinion on the case and only decide the case based upon the evidence presented at trial.  <u>See</u> 5/22/12 Trial Tr., at PageID.924–925 (Dkt. 11-8).  Such instructions cured any potential prejudice to Petitioner that may have ensued from the trial court's statements about the <u>Cobbs</u> evaluation. Jurors are presumed to follow the trial court's instructions.  <u>See</u> <u>Penry v. Johnson</u>, 532 U.S. 782, 799 (2001) (citing <u>Richardson v. Marsh</u>, 481 U.S. 200, 211 (1987)); <u>United States v. Powell</u>, 469 U.S. 57, 66 (1984) ("Jurors . . . take an oath to follow the law as charged, and they are expected to follow it.").  Petitioner fails to show that the trial court's comments were improper, let alone that they pierced the veil of judicial impartiality.

Additionally, it is well-settled that for habeas relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous or universally condemned.  Rather, taken as a whole, they must be so infirm that they rendered the entire trial fundamentally unfair.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 72 (1991); <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977).  A jury instruction is not to be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.

Jones v. United States, 527 U.S. 373, 391 (1999); Grant v. Rivers, 920 F. Supp. 769, 784 (E.D.

Mich. 1996).   The failure to give an instruction that is supported by the evidence does not

automatically justify habeas relief—the failure to instruct must have rendered the trial

fundamentally unfair.   Cupp v. Naughten, 414 U.S. 141, 147 (1973); Daniels v. Lafler, 501 F.3d

735, 741 (6th Cir. 2007).   "An omission, or an incomplete instruction, is less likely to be

prejudicial than a misstatement of the law."   Henderson, 431 U.S. at 155.   State law instructional

errors rarely form the basis for federal habeas relief.   Estelle, 502 U.S. at 71–72.   In this case,

for essentially the same reasons previously discussed, Petitioner fails to show that the trial court's

instructions to the jury in this regard were incorrect or that they rendered his trial fundamentally

unfair.   Habeas relief is not warranted on this claim.

### 2.      Jury Instruction Claim

Petitioner next asserts that he is entitled to habeas relief because the trial court failed to

instruct the jury on the lesser included offense of involuntary manslaughter.   Respondent

contends that this claim is waived and/or procedurally defaulted and that it lacks merit.

The Michigan Court of Appeals denied relief on this claim, explaining in relevant part:

"[A] requested instruction on a necessarily included lesser offense is proper if the
charged greater offense requires the jury to find a disputed factual element that is
not part of the lesser included offense and a rational view of the evidence would
support it." People v. Cornell, 466 Mich. 335, 357; 646 NW2d 127 (2002). "A
necessarily lesser included offense is an offense whose elements are completely
subsumed in the greater offense." People v. Mendoza, 468 Mich. 527, 540; 664
NW2d 685 (2003). "Involuntary manslaughter is the unintentional killing of
another, without malice, during the commission of an unlawful act not amounting
to a felony and not naturally tending to cause great bodily harm; or during the
commission of some lawful act, negligently performed; or in the negligent
omission to perform a legal duty." Id. at 536. The elements of involuntary
manslaughter are included in the offense of murder because the mens rea of
involuntary manslaughter is included in the greater mens rea of murder. Id. at
541. Involuntary manslaughter is therefore a necessarily included lesser offense

28

of murder. Id. "Consequently, when a defendant is charged with murder, an instruction for ... involuntary manslaughter must be given if supported by a rational view of the evidence." Id.

Here, a rational view of the evidence did not support an instruction on involuntary manslaughter. Defendant asserts on appeal that the jury could have inferred that defendant fired the gun accidentally or as a warning shot. However, there was no evidence presented at trial to support a theory that defendant killed the victim without malice. The testimony of multiple witnesses established that defendant aimed the gun at the victim and then shot him. This testimony does not suggest an accidental firing or a warning shot. Further, the defense theory at trial was that defendant did not kill the victim; defendant claimed that Huff was the shooter. Defendant testified that while in the Eight Mile median, Huff pulled out the gun and aimed it, and that defendant then heard a gunshot fired. Likewise, defense counsel argued in closing that "Mr. Huff never tells the truth because he is the one with the black gun and he is the shooter." See id. at 546–547 (holding that a rational view of the evidence did not support an involuntary manslaughter instruction where the defendant's theory at trial was that another person was responsible for the victim's death). Because a rational view of the evidence did not support an involuntary manslaughter instruction, the trial court did not plainly err in failing to provide such an instruction.

Jessie, 2014 WL 2751047, at *4.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. First, to the extent that Petitioner asserts that the trial court erred in instructing the jury under Michigan law, he merely alleges a violation of state law which does not justify federal habeas relief. See, e.g., Rashad v. Lafler, 675 F.3d 564, 569 (6th Cir. 2012) ("[A] state court's interpretation of the propriety of a jury instruction under state law does not entitle a habeas claimant to relief."). State courts are the final arbiters of state law and the federal courts will not intervene in such matters. Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Oviedo v. Jago, 809 F.2d 326, 328 (6th Cir. 1987); see also Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.");

Sanford v. Yukins, 288 F.3d 855, 860 (6th Cir. 2002).   Habeas relief does not lie for perceived errors of state law.   Estelle, 502 U.S. at 67–68.

Second, Petitioner fails to establish that the trial court's refusal to instruct the jury on involuntary manslaughter rendered his trial fundamentally unfair.   The Supreme Court has declined to determine whether due process requires jury instructions on lesser included offenses in non-capital cases.   Beck v. Alabama, 447 U.S. 625, 638 n. 14 (1980).   In Hopper v. Evans, 456 U.S. 605, 611 (1982), the Supreme Court ruled that a capital defendant is entitled to a lesser included offense instruction only when there is evidence to support it.   The Supreme Court has since held that state courts are not constitutionally required to instruct capital case juries on crimes which are not lesser included offenses of the charged crime.   Hopkins v. Reeves, 524 U.S. 88, 90–91 (1998).   The Sixth Circuit has interpreted Beck to mean that "the Constitution does not require a lesser-included offense instruction in non-capital cases."   Campbell v. Coyle, 260 F.3d 531, 541 (6th Cir. 2001) (citing Bagby v. Sowders, 894 F.2d 792, 795–797 (6th Cir. 1990) (en banc)); see also Scott v. Elo, 302 F.3d 598, 606 (6th Cir. 2002); Adams v. Smith, 280 F. Supp. 2d 704, 717 (E.D. Mich. 2003).   Second-degree murder is a non-capital offense in Michigan. Alexander v. Lafler, No. 11-10286, 2013 WL 3191134, at *5 (E.D. Mich. June 21, 2013). Consequently, an involuntary manslaughter instruction was not constitutionally required. Petitioner thus fails to state a claim upon which habeas relief may be granted as to this issue.

The Sixth Circuit has further stated that:

[S]uch a claim warrants habeas relief, if at all, only in the rare instance that "a fundamental miscarriage of justice is found to have resulted from the arbitrary and unsupportable denial of a lesser included offense instruction in clear defiance of state law."   Bagby, 894 F.2d at 795 (suggesting that habeas relief would be warranted only if the failure to give the requested instruction was "likely to have resulted in the conviction of an innocent person").

Richardson v. Campbell, No. 21-3421, 2021 WL 6773144, at *2 (6th Cir. Nov. 2, 2021), cert. denied, 142 S. Ct. 1389 (2022). Petitioner makes no such showing.

And even if Petitioner states a cognizable claim, he fails to show that the failure to instruct the jury on involuntary manslaughter was improper. As explained by the Michigan Court of Appeals, such an instruction was not warranted based upon the evidence at trial which showed that Petitioner pointed a loaded gun at the murder victim and fired it. Such action was sufficient to establish that he acted with the requisite intent to support his second-degree murder conviction. Moreover, Petitioner's defense to the murder charge was that he was not the shooter, not that he fired the gun accidentally or as a warning shot. Petitioner fails to show that the jury instructions, as given, rendered his trial fundamentally unfair. Habeas relief is not warranted on this claim.

### 3. Prosecutorial Misconduct Claim

Petitioner next asserts that he is entitled to habeas relief because the prosecutor engaged in misconduct during closing arguments by vouching for the credibility of witnesses. Respondent contends that this claim is procedurally defaulted and that is lacks merit.

The United States Supreme Court has made clear that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction." Berger v. United States, 295 U.S. 78, 88 (1935). To prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that the prosecutor's conduct or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); see also Darden v. Wainwright, 477 U.S. 168, 181 (1986) (citing Donnelly, 416 U.S. at 643); Parker, 567 U.S. at 45 (2012) (confirming the standard articulated in Donnelly and Darden). The standard "is a very general one, leaving courts more leeway . . . in reaching

31

outcomes in case-by-case determinations." Parker, 567 U.S. at 48 (punctuation modified).

"That leeway increases in assessing a state court's ruling under AEDPA" because the court "cannot

set aside a state court's conclusion on a federal prosecutorial-misconduct claim unless a petitioner

cites other Supreme Court precedent that shows the state court's determination in a particular

factual context was unreasonable." Stewart v. Trierweiler, 867 F.3d 633, 638–639 (6th Cir.

2017) (punctuation modified).

The Michigan Court of Appeals denied relief on this claim, explaining in relevant part:

Here, defendant complains of the following comments by the prosecutor during closing and rebuttal arguments:

But the bottom line is when [defendant] testified, ladies and gentlemen, he was not truthful. And I think that's pretty obvious from his testimony.
* * *
I submit to you he has a motive not to tell the truth in this particular case because of the obvious charges that he's facing. What reason do those witnesses have to lie? There is absolutely none.
* * *
I submit to you what he told you is hard to believe, but that again is up to you to determine, ladies and gentlemen.
* * *
I submit to you the evidence is clear as to what happened based upon eyewitness testimony during the middle of the day.
* * *
I submit to you there's no reason to doubt any of [three of the eyewitnesses'] testimony and what they saw, three of them, was this individual fire a weapon. [Emphasis added.]

The above comments did not comprise misconduct. The prosecutor was merely arguing from the facts and testimony that the eyewitnesses were worthy of belief and that defendant's testimony was unworthy of belief. Such argument from the facts and testimony is proper. Dobek, 274 Mich.App at 66–67. Viewed in context, all of the challenged comments were made in connection with a discussion of the evidence presented at trial and reasonable inferences from the evidence. Although the prosecutor argued from the evidence that the eyewitnesses lacked a motive to lie and that defendant had a motive to be untruthful given the charges he was facing, at no point did the prosecutor vouch for the credibility of the eyewitnesses

by suggesting special knowledge or express a personal belief about defendant's guilt. The prosecutor's use of the phrases "I think" and "I submit to you" does not require reversal where he did not improperly vouch for defendant's guilt. See People v. Cowell, 44 Mich.App 623, 628; 205 NW2d 600 (1973) ("If the prosecutor says 'I believe' rather than 'the evidence shows', this in and of itself does not constitute reversible error."). Because the prosecutor's closing and rebuttal arguments were based on the evidence and reasonable inferences from the evidence as they related to his theory of the case, the prosecutor did not commit misconduct.

In any event, even if the prosecutor's comments were improper, defendant has failed to establish that a timely curative instruction could not have alleviated any prejudice. Bennett, 290 Mich.App at 476. "Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements." Seals, 285 Mich.App at 22. And although defendant did not request a curative instruction, the trial court instructed the jury that the lawyers' statements and arguments were not evidence and that the jury should decide the case based only on the evidence admitted at trial. This instruction dispelled any potential prejudice with respect to the alleged prosecutorial misconduct. See People v. Parker, 288 Mich.App 500, 512; 795 NW2d 596 (2010); People v. Ullah, 216 Mich.App 669, 682–683; 550 NW2d 568 (1996). "It is well established that jurors are presumed to follow their instructions." Graves, 458 Mich. at 486. Thus, defendant has failed to establish that a plain error affected his substantial rights in connection with his unpreserved prosecutorial misconduct claim.

Jessie, 2014 WL 2751047, at *5-*6.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. It is improper for a prosecutor to express his or her own personal opinions about a defendant's guilt or a victim's or a witness's credibility. United States v. Young, 470 U.S. 1, 9–10 (1985); Hodge v. Hurley, 426 F.3d 368, 378 (6th Cir. 2005). Such statements are improper because they can convey the impression that the prosecutor has evidence not presented to the jury which supports the charges against the defendant thereby infringing upon the defendant's right to be judged solely based upon the evidence presented and because the prosecutor's opinion carries with it the imprimatur of the government and may induce

the jury to trust the government's judgment rather than its own.  <u>Young</u>, 470 U.S. at 18–19; <u>Cristini v. McKee</u>, 526 F.3d 888, 901 (6th Cir. 2008); <u>see also</u> <u>Wilson v. Bell</u>, 368 F. App'x 627, 633 (6th Cir. 2010) (citing cases).

In this case, the prosecutor did not improperly vouch for prosecution witnesses.   A review of the record reveals that the prosecutor based closing arguments on the trial testimony and argued from the evidence that Petitioner was not credible and that the prosecution witnesses were credible and should be believed.   A prosecutor has leeway to argue the evidence and reasonable inferences therefrom.  <u>Byrd v. Collins</u>, 209 F.3d 486, 535 (6th Cir. 2000).   Moreover, a prosecutor may argue from the facts that a witness is (or is not) worthy of belief.  <u>Portuondo v. Agard</u>, 529 U.S. 61, 69 (2000).   The prosecutor's use of the phrases "I submit" and "I think" were introductory to remarks on the evidence and the testimony and why the jury should find Petitioner guilty of the charged offenses.   The prosecutor did not improperly vouch for any witnesses nor imply that the government had knowledge of facts which were not presented to the jury. Petitioner fails to show that the prosecutor's argument was improper.

Moreover, even if the prosecutor erred, the trial court's instructions to the jurors about the proper consideration of witness testimony, that they should decide the case based upon the evidence presented at trial, and that the lawyers' statements and arguments are not evidence, <u>see</u> 5/22/12 Trial Tr., at PageID.924–925 (Dkt. 11-8), cured any potential prejudice to Petitioner. Jurors are presumed to follow the trial court's instructions.  See <u>Penry</u>, 532 U.S. at 799; <u>Powell</u>, 469 U.S. at 66.   Petitioner fails to show that the prosecutor's closing argument was improper and/or that it rendered his trial fundamentally unfair.   Habeas relief is not warranted on this claim.

### 4.     Ineffective Assistance of Trial Counsel Claim

Petitioner next asserts that he is entitled to habeas relief because trial counsel was ineffective for failing to object to the afore-mentioned jury instructions, alleged judicial bias, and conduct of the prosecutor.   Respondent contends that this claim lacks merit.

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court set forth a two-prong test for determining whether a habeas petitioner has received the ineffective assistance of counsel.   First, a petitioner must prove that counsel's performance was deficient.   This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment.   Strickland, 466 U.S. at 687.   Second, the petitioner must establish that counsel's deficient performance prejudiced the defense.   Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal.   Id.

As to the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" to prove deficient performance.   Id. at 690.   A reviewing court's scrutiny of counsel's performance is highly deferential.   Id. at 689.   Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.   Id. at 690.   The petitioner has the burden of overcoming the presumption that the challenged actions were sound trial strategy.   Id. at 689.

To satisfy the prejudice prong under Strickland, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."   Id. at 694.   A reasonable probability is one that is sufficient to undermine confidence in the outcome.   Id.   On balance, "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of

35

the adversarial process that the [proceeding] cannot be relied on as having produced a just result." Id. at 686.

The Supreme Court has confirmed that a federal court's consideration of ineffective assistance of counsel claims arising from state criminal proceedings is quite limited on habeas review due to the deference accorded trial attorneys and deference accorded state appellate courts reviewing their performance. "The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." Harrington, 562 U.S. at 105 (punctuation modified, citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

The Michigan Court of Appeals denied relief on this claim, explaining in relevant part:

"To prevail on a claim of ineffective assistance, a defendant must, at a minimum, show that (1) counsel's performance was below an objective standard of reasonableness and (2) a reasonable probability [exists] that the outcome of the proceeding would have been different but for trial counsel's errors." People v. Ackerman, 257 Mich. App 434, 455; 669 NW2d 818 (2003). "Defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy." Petri, 279 Mich. at 411. This Court does not substitute its judgment for that of counsel regarding matters of trial strategy, nor does it assess counsel's performance with the benefit of hindsight. Id. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." People v. Ericksen, 288 Mich. App 192, 201; 793 NW2d 120 (2010).

Here, defendant has failed to establish that defense counsel's performance fell below an objective standard of reasonableness. Defendant contends that defense counsel was ineffective for (1) permitting the trial court to pierce the veil of judicial impartiality by misleading the jury regarding the benefits Huff received for testifying, (2) failing to request a jury instruction on the lesser included offense of involuntary manslaughter, and (3) allowing the prosecutor to express his personal belief concerning defendant's credibility and the weight of the evidence. But as discussed above, defendant's underlying arguments on those issues are devoid of merit. That is, (1) the trial court did not pierce the veil of

36

judicial impartiality, (2) the evidence did not support an involuntary manslaughter instruction, and (3) the prosecutor did not commit misconduct. Defense counsel was not ineffective for failing to advance meritless arguments or raise futile objections concerning those issues. Id. Accordingly, defendant's ineffective assistance of counsel claim premised on his underlying meritless arguments must fail.

Jessie, 2014 WL 2751047, at *7.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. Given the Michigan Court of Appeals's decision, as well as this Court's determination that the underlying judicial bias, jury instruction, and prosecutorial misconduct claims lack merit (or that any error was harmless), Petitioner cannot establish that trial counsel erred and/or that he was prejudiced by counsel's conduct in failing to object at trial. Counsel cannot be deemed ineffective for failing to make a futile or meritless argument. Tackett v. Trierweiler, 956 F.3d 358, 375 (6th Cir. 2020); Hoffner v. Bradshaw, 622 F.3d 487, 499 (6th Cir. 2010). Petitioner fails to establish that trial counsel was ineffective under the Strickland standard. Habeas relief is not warranted on this claim.

### 5. Scoring of the Offense Variables Sentencing Claim

Petitioner next asserts that he is entitled to habeas relief because the trial court erred in scoring certain offense variables of the Michigan sentencing guidelines. Respondent contends that this claim is not cognizable and that it lacks merit.

A sentence imposed within the statutory limits is generally not subject to federal habeas review. Townsend v. Burke, 334 U.S. 736, 741 (1948); Cook v. Stegall, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999); see also Hutto v. Davis, 454 U.S. 370, 373–374 (1982) (finding that federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature). Claims which arise out of a state trial court's sentencing decision are

not normally cognizable upon habeas review unless the petitioner can show that the sentence imposed exceeded the statutory limits or is wholly unauthorized by law. Lucey v. Lavigne, 185 F. Supp. 2d 741, 745 (E.D. Mich. 2001). Petitioner's sentences are within the statutory maximum sentences for his offenses. See Mich. Comp. L. §§ 750.317 (authorizing a maximum sentence of life imprisonment for second-degree murder); 750.82 (authorizing a maximum sentence of 4 years imprisonment for felonious assault); 750.227 (authorizing a maximum sentence of 5 years imprisonment for carrying a concealed weapon); 750.224b (authorizing a maximum sentence of 2 years imprisonment for felony firearm); 750.81 (authorizing a maximum sentence of 93 days in jail for assault and battery). Consequently, his sentences are insulated from habeas review absent a federal constitutional violation.

The Michigan Court of Appeals denied relief on this claim, finding that Petitioner's minimum sentences were within the guideline range and that the disputed offense variables were properly scored under Michigan law. Jessie, 2014 WL 2751047, at *7–*10.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. Simply stated, Petitioner is not entitled to habeas relief on any claim challenging the scoring of the offense variables of the Michigan sentencing guidelines. Such a claim is not cognizable on federal habeas review because it is a state law claim. See Tironi v. Birkett, 252 F. App'x 724, 725 (6th Cir. 2007); Howard v. White, 76 F. App'x 52, 53 (6th Cir. 2003) ("A state court's alleged misinterpretation of state sentencing guidelines and crediting statutes is a matter of state concern only."); see also Kissner v. Palmer, 826 F.3d 898, 904 (6th Cir. 2016); McPhail v. Renico, 412 F. Supp. 2d 647, 656 (E.D. Mich. 2006). Alleged errors in scoring the offense variables and determining the sentencing guideline

38

range do not warrant federal habeas relief. State courts are the final arbiters of state law and federal courts will not intervene in such matters. Lewis, 497 U.S. at 780; Oviedo, 809 F.2d at 328; see also Bradshaw, 546 U.S. at 76; Sanford, 288 F.3d at 860. Habeas relief does not lie for perceived errors of state law. Estelle, 502 U.S. at 67–68.

A sentence may violate federal due process, however, if it is carelessly or deliberately pronounced on an extensive and materially false foundation which the defendant had no opportunity to correct. Townsend, 334 U.S. at 741; see also United States v. Tucker, 404 U.S. 443, 447 (1972) (citing Townsend, 334 U.S. 736); United States v. Sammons, 918 F.2d 592, 603 (6th Cir. 1990) (holding that defendant must have a meaningful opportunity to rebut contested sentencing information). To prevail on such a claim, a petitioner must show that the court relied upon the allegedly false information. United States v. Polselli, 747 F.2d 356, 358 (6th Cir. 1984); Draughn v Jabe, 803 F. Supp. 70, 81 (E.D. Mich. 1992). Petitioner makes no such showing. He had a sentencing hearing (and a Crosby hearing) before the state trial court with an opportunity to contest the scoring of the guidelines and the sentencing decision. Petitioner fails to establish that the state court relied upon materially false or inaccurate information in imposing his sentences which he had no opportunity to correct. He was afforded all the process he was due. Habeas relief is not warranted on this claim.

### 6. Sixth Amendment Sentencing Claim

Petitioner next asserts that he is entitled to habeas relief because the trial court erred by sentencing him based upon facts neither admitted by him nor proven beyond a reasonable doubt to the jury in violation of his Sixth Amendment rights. Respondent contends that this claim is moot and does not warrant additional relief.

The Michigan Court of Appeals initially denied relief on this claim, Jessie, 2014 WL 2751047, at *10, but the Michigan Supreme Court reversed and remanded the issue to the trial court to determine whether it would have imposed a materially different sentence under the sentencing procedure described in People v. Lockridge, 870 N.W.2d 502.   Jessie, 870 N.W.2d at 502.   On remand, the trial court ruled that it would have imposed the same sentences and affirmed Petitioner's original sentences.   Jessie, No. 11-237057-FC at *1–*2,(Aug. 31, 2016).   Following the remand, the Michigan Court of Appeals affirmed his sentences.   Jessie, 2018 WL 521971 at *1–*3.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.   This sentencing claim arises from the Supreme Court's decisions in Apprendi v. New Jersey, 530 U.S. 466 (2000), Blakely v. Washington, 542 U.S. 296 (2004); and Alleyne v. United States, 570 U.S. 99 (2013).   In Apprendi, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."   Apprendi, 530 U.S. at 490.   In Blakely, the Supreme Court clarified "that the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."   Blakely, 542 U.S. at 303.   In Alleyne, the Supreme Court extended Apprendi to mandatory minimum sentences, ruling that any fact that increases a mandatory minimum sentence is an "element" of the offense that must be submitted to the jury and proven beyond a reasonable doubt.   Alleyne, 570 U.S. at 111–112.

In Lockridge, the Michigan Supreme Court held that, under Alleyne, the Michigan

40

sentencing guidelines violate the Sixth Amendment because the guidelines "require judicial fact-finding beyond facts admitted by the defendant or found by the jury to score offense variables that *mandatorily* increase the floor of the guidelines minimum sentence range[.]" Lockridge, 870 N.W.2d at 506 (emphasis in original). The court thus struck the mandatory portions of the guidelines made the guidelines advisory only. Id. at 520–521. The remedy under Lockridge is a remand for the trial court to determine whether it would impose a materially different sentence absent the mandatory guidelines. Id. at 522–524 (citing United States v. Crosby, 397 F.3d 103 (2d Cir. 2005)). If the answer is yes, re-sentencing is required. Id.

The Sixth Circuit has since issued a decision agreeing with Lockridge and ruling that Alleyne clearly established that Michigan's pre-Lockridge mandatory minimum sentencing guidelines scheme violated the Sixth Amendment. Robinson v. Woods, 901 F.3d 710, 716–718 (6th Cir. 2018). The Sixth Circuit explained that "[a]t bottom, Michigan's sentencing regime violated Alleyne's prohibition on the use of judge-found facts to increase mandatory minimum sentences." Id. at 716. This Court is bound by the Sixth Circuit's decision.

In this case, assuming that Petitioner's initial sentences were imposed in violation of the Sixth Amendment, he is nonetheless not entitled to relief on this claim. As the record shows, Petitioner was afforded a Crosby hearing and the state trial court ruled that it would not impose a different sentence. The trial court's ruling and the Michigan Court of Appeals' subsequent denial of relief on this claim were reasonable. "The United States Supreme Court has not clearly established whether a defendant sentenced under an unconstitutional sentencing scheme is entitled to a full re-sentencing or only a Crosby hearing." Morrell v. Wardens, 12 F.4th 626, 632 (6th Cir. 2021) (citing cases). And the Sixth Circuit has held that "a Crosby remand is not

41

contrary to or an unreasonable application of clearly established federal law."   <u>Id</u>. at 633 (citing <u>Reign v. Gidley</u>, 929 F.3d 777, 780–783 (6th Cir. 2019)).   Given that Petitioner was afforded a <u>Crosby</u> hearing and he fails to show that re-sentencing is required, there is no additional relief for this Court to grant.

Petitioner is also not entitled to habeas relief on any claim that his sentences are unreasonable due to their length.   A claim that a sentence is disproportionate is not cognizable on federal habeas review because it is a state law claim.   <u>See</u> <u>Harmelin v. Michigan</u>, 501 U.S. 957, 965 (1991) (ruling that the Eighth Amendment does not require strict proportionality and that Michigan prisoner's claim that his sentence was disproportionate was not cognizable on habeas review); <u>Clarmont v. Chapman</u>, No. 20-1205, 2020 WL 5126476, at *1 (6th Cir. July 13, 2020) ("[A]ny state law challenge to the reasonableness of [petitioner's] sentence or argument that his sentence is disproportionate under state law is also not cognizable on habeas review."). There is no federal constitutional right to individualized sentencing.   <u>United States v. Thomas</u>, 49 F.3d 253, 261 (6th Cir. 1995).   As noted, state courts are the final arbiters of state law and federal courts will not intervene in such matters.   <u>Lewis</u>, 497 U.S. at 780; <u>Oviedo</u>, 809 F.2d at 328.

Petitioner also cannot establish that his sentences constitute cruel and unusual punishment under the Eighth Amendment.   The United States Constitution does not require strict proportionality between a crime and its punishment.   <u>Harmelin</u>, 501 U.S. at 965.   A sentence within the maximum penalty authorized by statute "generally does not constitute cruel and unusual punishment."   <u>Austin v. Jackson</u>, 213 F.3d 298, 302 (6th Cir. 2000) (punctuation modified).   As discussed, Petitioner's sentences are within the statutory maximums.   The state

trial court thus acted within its discretion in imposing sentence and there is no extreme disparity between Petitioner's crimes and sentences so as to offend the Eighth Amendment.   Habeas relief is not warranted on this claim.

### 7.   Witness Testimony and Ineffective Assistance of Counsel Claim

Lastly, Petitioner asserts that he is entitled to habeas relief because the Michigan Court of Appeals' finding that witness Darryl Gray identified Petitioner as the shooter is an unreasonable determination of the facts and trial counsel was ineffective for failing to argue to the jury that Gray had not identified Petitioner as the shooter.   Respondent contends that this claim is unexhausted and that it lacks merit.

A prisoner filing a habeas petition under 28 U.S.C. § 2254 must first exhaust state remedies.   See 28 U.S.C. §§ 2254(b)(1)(A) and (c); O'Sullivan, 526 U.S. at 845 (1999) ("State prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."); Rust v. Zent, 17 F.3d 155, 160 (6th Cir. 1994).   To satisfy the exhaustion requirement, a Michigan prisoner must raise each habeas claim before the Michigan Court of Appeals and the Michigan Supreme Court, Hafley v. Sowders, 902 F.2d 480, 483 (6th Cir. 1990), and must "fairly present" each claim by asserting both the factual and legal bases.   Williams v. Anderson, 460 F.3d 789, 806 (6th Cir. 2006) (citing McMeans v. Brigano, 228 F.3d 674, 681 (6th Cir. 2000)).   A federal habeas court, however, can deny relief on the merits of a claim despite the lack of exhaustion.   See 28 U.S.C. § 2254(b)(2).

In this case, Petitioner fails to show that the Michigan Court of Appeals' erred or that trial counsel was ineffective in this regard.   At trial, Darryl Gray identified Petitioner as the man in

the gray hoodie and testified that he first pointed the gun at him and then at the victim, that a shot was fired, and that the victim fell to the ground. See 5/15/12 Trial Tr. at PageID.572–573 (Dkt. 11-3). Petitioner's assertion to the contrary is belied by the record. Gray also testified that he did not see any other gun. Id. at PageID.582. Petitioner thus fails to rebut the Michigan Court of Appeals' factual finding in this regard with clear and convincing evidence, see 28 U.S.C. § 2254(e)(1); Warren, 161 F.3d at 360–361. Petitioner also fails to show that trial counsel erred and/or that he was prejudiced by counsel's conduct. To be sure, trial counsel challenged Gray's identification during cross-examination and recalled him as a witness for the defense. See 5/15/12 Trial Tr. at PageID.580–581 (Dkt. 11-3); 5/22/12 Trial Tr. at PageID.871–872 (Dkt. 11-8). Petitioner does not show what more counsel could have done that would have affected the outcome at trial. He fails to establish that counsel was ineffective under the Strickland standard. Habeas relief is not warranted on this claim.

## IV. CONCLUSION

For the reasons stated, the Court concludes that Petitioner is not entitled to federal habeas relief on his claims. Accordingly, the Court denies and dismisses with prejudice the petition for a writ of habeas corpus.

Before Petitioner may appeal, a certificate of appealability (COA) must issue. See 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A COA may issue only if a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a federal court denies relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the claims debatable or wrong. Slack v. McDaniel, 529 U.S. 473, 484–485 (2000). "A petitioner satisfies this standard

by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve

encouragement to proceed further." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003).   Petitioner

makes no such showing as to his habeas claims.   Accordingly, the Court denies a COA.

     Lastly, the Court concludes that an appeal cannot be taken in good faith.   <u>See</u> Fed. R.

App. P. 24(a).   Accordingly, the Court denies Petitioner leave to proceed in forma pauperis on

appeal.

     It is so ordered.

Dated: December 28, 2023          s/Mark A. Goldsmith
Detroit, Michigan                 MARK A. GOLDSMITH
                             United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and
any unrepresented parties via the Court's ECF System to their respective email or First Class
U.S. mail addresses disclosed on the Notice of Electronic Filing on December 28, 2023.

         s/J. McCoy
         Case Manager